2009 ME 27

**Kathleen KELLEY**

v.

**MAINE PUBLIC EMPLOYEES RETIREMENT SYSTEM.**

Supreme Judicial Court of Maine.

Argued: Jan. 14, 2009.
Decided: March 12, 2009.

Charles R. Priest, Esq. (orally), Law Office of Charles Priest, Augusta, ME, for Kathleen Kelley.

G. Steven Rowe, Attorney General, Christopher L. Mann, Asst. Atty. Gen. (orally), Augusta, ME, for the Maine Public Employees Retirement System.

Panel: CLIFFORD, and ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

MEAD, J.

[¶ 1] Kathleen Kelley appeals from a judgment of the Superior Court (Kennebec County, *Mills, J.*) affirming the decision of the Board of Trustees (Board) of the Maine Public Employees Retirement System (MPERS).[1] 5 M.R.S. § 11008 (2008); M.R. Civ. P. 80C. Following an administrative appeal, the Board determined that Kelley did not prove that she is unable to engage in substantially gainful activity, and therefore discontinued her disability retirement benefits. On appeal, Kelley argues that the Board: (1) erred in not providing Kelley with an independent medical examination prior to rendering its decision; (2) was collaterally estopped from deciding that she no longer qualifies for disability retirement benefits; (3) erred in refusing Kelley's request to cross-examine the medical board on its memoranda; and (4) erred in not adopting the hearing officer's recommendation. Finding no error in the Board's actions or decision, we affirm the judgment.

## I. BACKGROUND

[¶ 2] Kelley, aged fifty-one, is a high school graduate who resides in Vienna, Maine. In December 1977, she was hired by the Department of Motor Vehicles as a window clerk/service representative. After three and one-half years in this position, she was promoted to a drivers' license examiner, a job she held for approximately six and one-half years.

[¶ 3] In 1986, while inspecting a vehicle before administering a road test, Kelley slipped on some ice and landed on her tailbone.[2] After this injury, Kelley continued to work for the Department of Motor Vehicles, but had difficulty completing an eight-hour workday.[3] In 1990, Kelley applied for and began receiving disability retirement benefits through MPERS.

[¶ 4] In December 1997, MPERS undertook a periodic review of Kelley's file and determined that she was no longer entitled to disability benefits. Kelley contested this decision and submitted additional medical evidence. In April 1998, the MPERS executive director determined that "due to [Kelley's] back injury, [she was] currently unable to perform or participate in any activity or activities, tasks or efforts that are or could be performed in such a manner as to generate remuneration in an amount which is consistent with [her] average final compensation." The December 1997 decision was reversed, and Kelley's disability benefits continued.

[¶ 5] On March 19, 2004, MPERS initiated another periodic review pursuant to 5 M.R.S. § 17907(2)(B) (2008).[4] As part of

---

1. The Maine Public Employees Retirement System was formerly known as the Maine State Retirement System. Effective September 20, 2007, P.L. 2007, ch. § 58, 1 amended 5 M.R.S. § 17101(2) (2008) to change the name.

2. In 1979, Kelley injured her back on the job while lifting an overloaded examination kit. It is not clear whether this injury was exacerbated by her fall on the ice.

3. The record shows that Kelley was employed as a drivers' license examiner until June 1988.

4. Title 5 M.R.S. § 17907(2)(B) (2008) provides:

   **2. Cessation.** Payment of disability retirement benefits shall continue so long as a person is disabled, except that:

   . . . .

   **B.** After the disability has continued for 5 years, the disability of the beneficiary must render the beneficiary unable to engage in any substantially gainful activity for

the review, Kelley's primary care physician, Dr. Ann Schwink, completed a medical certificate for disability retirement benefits in which she noted Kelley's chronic lower back pain. Kelley's functional limitations included that she "cannot sit or stand any length of time, [and] cannot lift."

[¶ 6] The MPERS medical board reviewed Kelley's medical records on file, including Dr. Schwink's medical certificate, and in its first memorandum to the executive director noted: "There have been no treatments regarding [Kelley's] back in the medical evidence of record for the past few years. We note that there are indications of a considerably active life style." The medical records did not support Dr. Schwink's statement on functional limitations, and the medical board requested further information from Dr. Schwink on Kelley's functional limitations, including range of motion, motor reflex, and sensory findings. In her reply, Dr. Schwink stated that she had "not specifically evaluated [Kelley] in terms of her functional abilities and would refer that evaluation to someone with more expertise with disability issues."

[¶ 7] In June 2004 and December 2004, the medical board stated in memoranda to the executive director that "no functional limitations are considered warranted at this time" and "[t]here is not enough information in the recent medical records to establish functional limitations."

[¶ 8] On June 5, 2006, the executive director notified Kelley that her disability retirement benefits would be terminated because she had not demonstrated the inability to engage in substantially gainful activity.[5] Kelley appealed the decision to the Board pursuant to 5 M.R.S. § 17451(1) (2008).

[¶ 9] Kelley submitted additional medical information to the medical board, and on October 12, 2006, the medical board issued a fourth memorandum. The memorandum stated that the new medical records continue to support Kelley's back injury, a condition known as "degenerative disc disease of the lumbar spine." As for functional limitations, the medical board stated:

> No work requiring repeated bending, stooping, lifting from the floor, lifting more than ten pounds occasionally from

which the beneficiary is qualified by training, education or experience. For purposes of this paragraph, the ability to engage in substantially gainful activity is demonstrated by the ability to perform work resulting in annual earnings that exceed $ 20,000 or 80% of the recipient's average final compensation at retirement, whichever is greater, adjusted by the same percentage adjustments granted under section 17806.

(1) The executive director may require, once each year, a recipient of a disability retirement benefit to undergo medical examinations or tests, conducted in accordance with section 17903, to determine the disability of the beneficiary.

(2) If the beneficiary refuses to submit to the examination or tests under subparagraph (1), the beneficiary's disability retirement benefit is discontinued until the beneficiary withdraws the refusal.

(3) If the beneficiary's refusal under subparagraph (2) continues for one year, all the beneficiary's rights to any further benefits under this article cease.

(4) If it is determined, on the basis of the examination or tests under subparagraph (1), that the disability of a beneficiary no longer exists, the payment of the beneficiary's disability retirement benefit ceases;

5. In the notice, substantially gainful activity is defined as "the ability to engage in remunerative activity that would result in [Kelley] earning an amount equal to 80% of [her] average final compensation adjusted by the same percentage that has been received for cost of living allowance. In [Kelley's] case the amount is $21,265.92." *See also* 5 M.R.S. § 17907(2)(B).

table height, no working in awkward positions, no ladders, or working from unprotected heights. She may sit eight hours in an eight-hour workday with freedom to move about as needed. This equates to a full-time sedentary work capacity. The condition and limitations are permanent.

The executive director issued a letter on October 24, 2006, affirming its June 5, 2006, determination.

[¶ 10] Beginning in January 2007, a series of hearings on Kelley's appeal occurred before a hearing officer. The hearing officer heard testimony from Kelley; Harold Kelley, who is Kelley's husband; Eileen Kalikow, a vocational rehabilitation counselor and career counselor who was Kelley's witness; Dr. Schwink; and Hildegarde Covens–Heary, a certified vocational rehabilitation counselor who was MPERS's witness.

[¶ 11] On May 15, 2007, after reviewing Kelley's entire medical record, as well as a transcript of Dr. Schwink's testimony before the hearing officer, the medical board issued its fifth and final memorandum. The medical board stated that in its opinion, "the functional limitations stated in the Medical Board Memorandum dated October 12, 2006 remain the same." The executive director issued a letter on May 31, 2007, again affirming its June 5, 2006, decision.

[¶ 12] In September 2007, the hearing officer issued her report on Kelley's appeal. With regard to Kelley's ability to engage in physical activities, the hearing officer noted that recently Kelley: assisted her husband in building a roof over the back door; was the primary caretaker of an elderly uncle; cared for a farm and garden; tried to move a boulder using a tree as a lever. The hearing officer found that she currently walks two to two and one-half miles, five days a week; cooks and prepares dinner for herself and her husband every day; does housework including laundry, vacuuming, and grocery shopping; and drives a car two to three days a week. The hearing officer also noted that "the medical records continually confirm that Ms. Kelley's [back] condition is permanent, and do not show any real improvement in her physical condition from the time she was first awarded disability benefits in 1990 to the present." The hearing officer found "ample support for Ms. Kelley's assertion and Dr. Schwink's medical opinion that Ms. Kelley cannot stand or sit for more than 30 minutes at one time without changing her position" and concluded that "[i]n light of Ms. Kelley's restrictions and her lack of office skills, ... the evidence supports a conclusion that it is more likely than not that Ms. Kelley would not be able to find a job consistent with her experience, training and work restrictions to enable her to earn her [substantially gainful activity] amount." The hearing officer recommended a determination that Kelley cannot engage in any substantially gainful activity due to her lower back condition, and a reversal of the executive director's decision.

[¶ 13] The Board considered the hearing officer's report at its meeting on October 11, 2007. After discussion, the Board voted three to three on a motion to accept the report. Pursuant to Board policy, a tie vote meant that the pending appeal was denied.

[¶ 14] In a written decision dated December 28, 2007, the Board rejected the hearing officer's recommendation and affirmed the executive director's decision to discontinue Kelley's disability retirement benefits. The Board stated that Kelley experiences a "continued existence of a back injury referred to as 'progressive lumbar spine degenerative disc disease.'"

Her "[f]unctional limitations ascribed by the [medical board] were a full-time sedentary work capacity, with eight hours of sitting in an eight-hour workday with freedom to move about as needed." The Board also found that MPERS "identified several occupations at which [Kelley] could earn her [substantially gainful activity] amount." [6]

[¶ 15] Kelley appealed to the Superior Court, which affirmed the Board's decision. This appeal followed.

## II. DISCUSSION

### A. Standard of Review

[¶ 16] When, as here, the Superior Court acts as an intermediate appellate court, we review the decision of the Board directly for errors of law, abuse of discretion, or findings of fact unsupported by competent and substantial evidence in the record. *Richardson v. Bd. of Trs. of the Me. State Ret. Sys.*, 1998 ME 171, ¶ 4, 714 A.2d 154, 156. "The party seeking to vacate an agency decision bears the burden of persuasion." *Martin v. City of Lewiston*, 2008 ME 15, ¶ 9, 939 A.2d 110, 113. "When an agency concludes that the party with the burden of proof failed to meet that burden, we will reverse that determination only if the record compels a contrary conclusion to the exclusion of any other inference." *Hale–Rice v. Me. State Ret. Sys.*, 1997 ME 64, ¶ 17, 691 A.2d 1232, 1237 (quoting *Douglas v. Bd. of Trs. of the*

*Me. State Ret. Sys.*, 669 A.2d 177, 179 (Me.1996)).

### B. Medical Exam

[¶ 17] The statutory provisions governing Kelley's disability benefits are set forth in 5 M.R.S. §§ 17901–17911 (2008).[7] Title 5 M.R.S. § 17907 provides the manner in which disability payments are commenced, in section 17907(1), and terminated, in section 17907(2). Kelley argues that section 17907(2)(B)(4) confers upon her the right to an independent medical exam before her disability benefits may be discontinued.

[¶ 18] Section 17907(2) provides that the "[p]ayment of disability retirement benefits shall continue so long as the person is disabled, *except that ...*" (emphasis added). The general rule is that as long as a person is disabled, he or she will continue to receive disability benefits.[8] By stating "except that," however, the Legislature has set forth other instances, apart from a person no longer being disabled, when disability benefits will be terminated. The first instance arises when the beneficiary becomes eligible for service retirement benefits. 5 M.R.S. § 17907(2)(A). The second instance arises when a disability no longer renders "the beneficiary unable to engage in any substantially gainful activity for which the beneficiary is qualified by training, education or experience." 5 M.R.S. § 17907(2)(B). According to the statute, even if the disability of an individ-

---

6. Ms. Covens–Heary submitted a labor market survey based on the medical board's October 2006 description of Kelley's functional limitations. Her survey demonstrated the availability of twenty-nine positions, most entry level, all sedentary in nature, and all requiring only a high school diploma. Examples include a dispatcher, appointment setter, billing clerk associate, call center representative, and receptionist.

7. Article 3, 5 M.R.S. §§ 17901–17911 (2008), applies "to all disabilities for which written applications are received by the executive director before October 1, 1989. All disabilities for which written applications are received by the executive director after September 30, 1989, are subject to article 3-A." 5 M.R.S. § 17901–A. There is no dispute that the provisions from Article 3 apply.

8. Disabled as used here means "mentally or physically incapacitated." 5 M.R.S. § 17901.

ual persists, benefits can still be terminated if the individual satisfies the eligibility requirements for service retirement benefits, or the individual can engage in substantially gainful activity as defined by statute.

[¶ 19] Here, Kelley's disability retirement benefits were discontinued not because she was unable to demonstrate that she was disabled, but because she had not demonstrated an inability to engage in substantially gainful activity. The purpose of the medical examinations or tests referenced in section 17907(2)(B)(1) is *"to determine the disability* of the beneficiary," not to determine the beneficiary's ability to engage in substantially gainful activity. (Emphasis added.) Thus, if there is an issue as to whether an individual continues to be disabled, a medical exam may be required. The plain language of the statute, however, does not make an independent medical exam mandatory when the issue upon review is whether an individual can engage in substantially gainful activity.[9] Because Kelley's disability was not in question, section 17907(2)(B)(1) is not applicable and section 17907(2)(B)(4) is not invoked.

[¶ 20] The statute clearly provides for the cessation of benefits when: (1) an individual is no longer disabled, as determined by medical exams or tests; (2) an individual has become eligible for service retirement benefits; or (3) an individual can engage in substantially gainful activity. The statute does not require a medical examination to determine a beneficiary's ability to engage in substantially gainful activity.[10] Therefore, the termination of Kelley's benefits without an independent medical exam was proper.

## C. Collateral Estoppel

[¶ 21] Kelley argues that the issue of whether she can engage in substantially gainful activity was previously decided in 1998, when the medical board concluded that she could not "perform or participate in any activity or activities, tasks or efforts" that would "generate remuneration in an amount which is consistent with [her] average final compensation." Kelley argues that the doctrine of collateral estoppel barred MPERS from litigating the issue of whether she can engage in substantially gainful activity in 2006.

[¶ 22] Collateral estoppel does not apply here, however, because the facts at issue in MPERS's 1998 decision are undeniably different from those at issue in 2006. Collateral estoppel only prevents the relitigation of factual issues when the identical issue was already determined by a prior final judgment. *Portland Water Dist. v. Town of Standish*, 2008 ME 23,

---

9. The Code of Maine Rules supports this analysis. 12 C.M.R. 94 411 202–2 § 3(C) (2008) states, "The Medical Board *may* recommend to the Executive Director specific tests to be performed upon the recipient of a disability retirement allowance to determine his capacity to engage in a substantially gainful activity for which he is qualified by training, education or experience." (Emphasis added.) Tests concerning the issue of substantially gainful activity are clearly discretionary.

10. Neither does case law require a medical examination prior to the cessation of benefits when the issue is whether one can engage in substantially gainful activity. In *Rodriques v. Maine State Retirement System*, 1997 ME 56, 691 A.2d 1205, the beneficiary's disability was at issue, with the beneficiary claiming that the pain he experienced in his left knee and back was caused by his original right knee disability. *Id.* ¶ 7, 691 A.2d at 1207. We *did not* hold in *Rodriques* that an independent medical exam was required for *every* review of disability benefits; rather, we merely clarified that if the executive director requests a medical exam to evaluate an individual's disability, the physician must conduct an independent and objective exam.

¶ 9, 940 A.2d 1097, 1100. In 1998, the issue was whether Kelley's lower back problem, *as it existed in 1998*, prevented her from engaging in substantially gainful activity. In 2006, the issue was whether Kelley's lower back problem, *as it existed in 2006*, prevented her from engaging in substantially gainful activity. As MPERS points out, in the span of eight years, medical conditions can improve and physical limitations can decrease with medical advancements. Evidence was offered in the 2006 proceedings that did not exist in 1998.

■■■ [¶ 23] In addition, the statutory framework of retirement disability benefits anticipates and allows for periodic review of the circumstances of individuals who receive disability benefits. After each review, MPERS makes a new factual determination on whether benefits should continue. Such review is necessary to ensure that only those entitled to benefits receive benefits. *Carr v. Bd. of Trs. of the Me. State Ret. Sys.*, 643 A.2d 372, 376 (Me.1994) ("[T]he Legislature intended that a disabled employee be re-evaluated periodically for ability to engage in a gainful occupation.... The purpose of disability retirement is to provide replacement wages during a period of incapacity, and benefits are meant to terminate with the end of the worker's incapacity.") If we were to apply the doctrine of collateral estoppel, MPERS would be unable to complete its statutory obligation to perform periodic reviews. MPERS is not barred by the doctrine of collateral estoppel from pursuing subsequent reviews of whether Kelley can engage in any substantially gainful activity.

### D. Cross-examination

[¶ 24] Kelley argues that the medical board's memoranda are "prefiled testimony" pursuant to 5 M.R.S. § 9057(4) (2008), and that she was prejudiced by the inability to cross-examine the medical board on its findings in these memoranda at the appeal hearing.[11]

■■■ [¶ 25] Title 5 M.R.S. § 9057(4) provides, "An agency may, for the purpose of expediting adjudicatory proceedings, require procedures for the prefiling of all or part of the testimony of any witness in written form. Every such witness shall be subject to oral cross-examination." The memoranda written by the medical board are not produced for the purpose of expediting adjudicatory proceedings. Instead, the purpose of these writings is to inform the executive director and Board as to the medical board's view on the existence of a disability that would entitle an applicant to benefits. 5 M.R.S. § 17106(3)(D) (2008). The medical board is not a third-party witness who provides expert testimony at a hearing; rather, the medical board is an advisor to MPERS, providing its report and information directly to the executive director and Board. *See Thomas v. Me. State Ret. Sys.*, 2008 WL 4106400, 2008 Me.Super. Lexis 149, 6 (Apr. 8, 2008). As such, Kelley was not entitled to cross-examine members of the medical board.

### E. Hearing Officer's Recommendation

■■■ [¶ 26] Finally, Kelley argues that the facts support the hearing officer's recommendation that she cannot engage in substantially gainful activity, and that the Board erred when it rejected this recommendation.

---

11. At the January 19, 2007, hearing, Kelley objected to the admission of the medical board memoranda because she was unable to cross-examine the members of the medical board. The hearing officer overruled the objection.

 [¶ 27] It is the final decision of the Board, and not of the hearing officer, that is subject to review. *Green v. Comm'r of the Dep't of Mental Health, Mental Retardation & Substance Abuse Servs.*, 2001 ME 86, ¶ 12, 776 A.2d 612, 616. As the unsuccessful party before the Board, Kelley has the burden to show "*more* than that there was competent evidence to support her position; she has to demonstrate that there was *no competent evidence* to support [the Board's] findings." *Id.* (emphasis in original).

[¶ 28] Although there is consensus among Kelley's doctors, the medical board, the hearing officer, the executive director, and the Board that Kelley suffers from lower back pain, there is disagreement as to how this condition translates into a functional limitation and thus impacts her ability to engage in substantially gainful activity. Dr. Schwink's assessment that Kelley is unable to stand or sit for more than thirty minutes at one time without changing her position [12] is in contrast to the evidence of Kelley's fairly active lifestyle, which includes walking, gardening, household chores, and caretaking.

[¶ 29] On appeal, the Board was free to investigate and consider all issues of fact or law. 5 M.R.S. § 17451(1)(B). Based on the evidence of Kelley's active lifestyle, the Board could have concluded, as it did, that despite her lower back problems, Kelley could maintain an eight-hour workday, provided that she had the freedom to move about as needed. MPERS's vocational expert provided numerous examples of employment positions that would satisfy this requirement. Because there is competent evidence to support the Board's conclusion, the decision must be affirmed.

The entry is:

Judgment affirmed.

---

**12.** Dr. Schwink was the only medical professional to reach this conclusion and only decided to give an opinion on functional limitations because "[Kelley] had so much on her plate that [she] couldn't expect [Kelley] to see another doctor for yet another evaluation."

Dr. Schwink's records show that on March 16, 2004, Kelley felt great, but on May 17, 2004, after MPERS had initiated its review, Dr. Schwink concluded that Kelley could not sit or stand for any length of time.